# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Rebecca*, 2012 IL App (2d) 091259

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL C. REBECCA, Defendant-Appellant.–THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL C. REBECCA, Defendant-Appellant. |
| District & No. | Second District<br>Docket Nos. 2-09-1259, 2-10-0303, 2-11-0204 cons. |
| Filed | April 20, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for multiple sexual offenses with multiple victims who were children of defendant's acquaintances were upheld over his contentions that the trial court failed to give an instruction that aggravated criminal sexual abuse was a lesser included offense of criminal sexual assault, that the instructions improperly expanded the charges, that the prosecutor made improper comments in closing arguments, that defendant's trial counsel was ineffective in submitting certain psychological materials during the sentencing hearing, and that the evidence was insufficient to sustain certain convictions with regard to one victim. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, Nos. 07-CF-4272, 07-CF-4810; the Hon. Theodore S. Potkonjak, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Johannah B. Weber and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer, Mary Beth Burns, and Kristin M. Schwind, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE BOWMAN delivered the judgment of the court, with opinion.
Justice Zenoff concurred in the judgment and opinion.
Justice McLaren dissented, with opinion.

**OPINION**

¶ 1        Defendant, Michael C. Rebecca, was indicted in two separate trial court proceedings for multiple sexual offenses involving multiple victims. The charges culminated in three jury trials, involving three of the victims, R.C., T.S., and A.W.

¶ 2        After the jury trial on the charges relating to R.C., defendant was convicted of 10 counts of criminal sexual assault (720 ILCS 5/12-13(a)(4) (West 2006)) and 10 counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(f) (West 2006)). Defendant was sentenced to 60 years' imprisonment.

¶ 3        After the jury trial on the charges relating to T.S., defendant was convicted of 10 counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2006)), 10 counts of criminal sexual assault, and 8 counts of aggravated criminal sexual abuse. After the jury trial on the charges relating to A.W., defendant was convicted of four counts of criminal sexual assault and four counts of aggravated criminal sexual abuse. Defendant was sentenced to a total of 180 years' imprisonment for the charges relating to T.S. and A.W. Defendant appealed all three judgments, under case numbers 2-09-1259 (R.C.), 2-10-0303 (T.S.), and 2-11-0204 (A.W.), making many of the same arguments in each appeal. This court consolidated the appeals on our own motion.

¶ 4        Defendant argues that: (1) the trial court erred in failing to instruct the juries on aggravated criminal sexual abuse as a lesser included offense of the criminal sexual assault charges; (2) the jury instructions improperly expanded the charges in the indictments; (3) he was denied fair trials when the prosecutors made improper remarks in closing arguments; (4) trial counsel rendered ineffective assistance when certain psychological materials were submitted in error during his sentencing hearings; and (5) the evidence was insufficient to sustain his convictions of the charges relating to T.S. We affirm.

## I. BACKGROUND

### A. Trial Involving R.C.

On December 5, 2007, a grand jury issued a 99-count indictment against defendant for sexual crimes against multiple victims in trial court case number 07-CF-4272. The counts that eventually went to trial in that case related to R.C. Specifically, those counts were: counts XI through XV (criminal sexual assault where defendant held a position of trust and placed his mouth on the penis of R.C.); counts XVI through XX (criminal sexual assault where defendant held a position of trust and placed his penis in the mouth of R.C.); counts XLVII through LI (aggravated criminal sexual abuse where defendant held a position of trust and placed his penis in the hand of R.C. for the purpose of defendant's sexual gratification); and counts LII through LVI (aggravated criminal sexual abuse where defendant held a position of trust and placed his hand on the penis of R.C. for the purpose of defendant's sexual gratification).

On October 21, 2008, defendant filed a motion for a bill of particulars. In that motion, defendant stated that all of the counts in the indictment "include the following additional element–that when the act was committed the Defendant '...held a position of trust, authority, or supervision in relation to the victim.' " Defendant stated that the indictment was "devoid of any specific articulation of facts or evidence of any trust, authority, or supervision as to a) each individual victim, and b) *** each time and act of misconduct with the individual victim." After delays due to defendant's health problems, defendant filed on July 13, 2009, a motion to compel the State to respond to his earlier motion for a bill of particulars. On August 6, 2009, the State filed its response, which contained the following information: defendant was a friend of several of the victims' parents; each victim spent days and nights at defendant's apartment; the victims would play games on defendant's computer and watch movies or play video games on defendant's television; and defendant would provide the victims with food and drink. In addition, as to R.C., the State provided that R.C.'s parents had known defendant for over 25 years prior to November 2007, and they considered him a good friend. Further, defendant had known R.C. since he was born; R.C. spent the night at defendant's apartment on many occasions; defendant was the adult responsible for watching him; R.C.'s parents knew when he stayed with defendant overnight; and they knew of other parents who allowed their children to spend the night at defendant's apartment. On September 2, 2009, the defense again requested disclosure of specific statements or facts to demonstrate that defendant held a position of trust. The State responded that R.C. was allowed to spend many nights at defendant's home, where defendant was the adult in charge of the apartment and R.C.

On September 10, 2009, defendant moved to dismiss the indictment, alleging that the indictment insufficiently alleged the crimes with specificity and insufficiently alleged facts to support a position of trust, authority, or supervision. On September 11, the court heard arguments on the motion's allegation as to the position of trust, authority, or supervision. The State informed the court that it had tendered to the defense statements from the parents that addressed the issue of trust, supervision, or authority, and the matter was continued. On September 14, the court heard the motion and defendant argued that the State presented evidence on the other victims on the issue of trust, authority, or supervision but did not

present specific information as to R.C.'s relationship with defendant. The State responded that it presented information as to R.C. spending many nights with defendant in defendant's home and under his care and that such evidence was sufficient to establish the position under *People v. Secor*, 279 Ill. App. 3d 389 (1996). The court denied the motion, finding that the State was not required to prove each element before the grand jury. Further, the court found that sufficient evidence was presented to the grand jury for it to decide to issue the indictment.

¶ 10 Defendant's trial commenced on September 15, 2009. During opening statements, the State argued that defendant held a position of trust in relation to R.C. through the nature of their relationship: that he was "Uncle Mike," a close friend to R.C.'s family for R.C.'s entire life. The State argued that defendant participated in R.C.'s holidays and birthdays and that R.C. and his parents trusted defendant enough to allow defendant to babysit R.C. and his siblings and provide R.C. with his medication. Defense counsel argued that, if there was no position of trust, authority, or supervision, the oral sex that occurred with R.C. after the age of 17 would be legal. Defense counsel argued that, as to "the element of position of trust and authority," it was not enough to say that the parents of R.C. trusted defendant. Defense counsel argued that defendant was not a teacher, counselor, coach, or man of the cloth.

¶ 11 P.C., the father of R.C., testified that he had two children, R.C., age 19, and E.C., age 15. P.C. met defendant while they both were employed by Abbott Laboratories, sometime before P.C. had kids. They became friends, and defendant interacted with P.C.'s whole family. Defendant would go to the movies or rent movies with the family. Initially defendant had contact with the children when he would go to the movies with the family or they would spend time at each other's homes. Over time, defendant had more social contacts with the children, such as attending birthday parties or other kinds of social events. Defendant would also interact with the children at Christmas and exchange gifts with the family. Defendant was close to the family, and the children referred to him as "Uncle Mike."

¶ 12 P.C. testified that defendant babysat the children many times over the years. P.C. gave defendant instructions on R.C.'s care, including how and when to administer R.C.'s epilepsy medication and making sure that R.C. completed his homework. As R.C. got older (around age 12 or 13), he was allowed to spend nights at defendant's home. Initially, the overnight visits occurred every other month or less. Around age 14 or 15, the overnight visits occurred approximately monthly. P.C. was never worried about R.C. while he was with defendant. The instructions P.C. gave to defendant about R.C.'s care were always followed. If R.C. had to be someplace, such as church, after spending the night with defendant, defendant made sure he got there on time. E.C. would also spend nights at defendant's home, usually when defendant's niece was visiting, as she was close to E.C.'s age. R.C. would often help defendant with household chores. In addition to the overnight visits, R.C. also spent time with defendant on outings, such as going to Cubs games or hockey games. Whenever R.C. was with defendant, P.C. considered defendant "in charge of [his] son." He also listed defendant as a medical emergency contact with R.C.'s school. On cross-examination, P.C. admitted that he never paid defendant to babysit.

¶ 13 J.C., the mother of R.C., testified to much of the same–that defendant was a close family friend over the course of many years. Defendant participated in many social functions with

the family, including movies, sporting events, birthday parties, and Christmas. Defendant had known R.C. since the day he was born. She also testified that defendant would care for R.C. during overnight visits, including preparing his meals, ensuring that he did homework, and administering his epilepsy medication. Sometimes defendant would help R.C. with his homework, and he would take R.C. to church the next day. R.C. sometimes helped defendant with his household chores. Over the years, J.C. observed defendant correct R.C.'s behavior, such as telling him not to talk back to his parents and reminding him that he should be bringing the garbage cans back in so she would not have to do it. R.C. always listened to defendant when he told him to do things or corrected his behavior. When R.C. was in defendant's care, J.C. considered defendant "in charge" of R.C.

¶ 14    R.C. testified that he had known defendant since he was born. One of R.C.'s first memories of defendant was when he sat by the window waiting for defendant to drive up for Christmas. R.C. referred to defendant as "Uncle Mike" or just "Mike." R.C. recalled seeing defendant once or twice a month before he was in middle school. That increased to three or four times a month during middle school and more in high school. Defendant babysat R.C. on several occasions. While he was in defendant's care, defendant provided food for him, told him when he had to go to bed, and helped him with his homework. R.C. did chores for defendant when defendant asked him to. If defendant told R.C. to do anything, he did it "because he was in charge. It was his house."

¶ 15    R.C. testified that the sexual contact with defendant began when he was in sixth grade. It started when they watched the children's movie, "Lilo and Stitch," and they "mooned" each other. The mooning progressed to defendant touching R.C.'s penis when he was about 12 years old. Defendant touched R.C.'s penis "hundreds of times or more" over the years since then. R.C. testified that defendant would masturbate him until he ejaculated. R.C. also masturbated defendant until defendant ejaculated. R.C. performed oral sex on defendant, and defendant would ejaculate. Defendant also performed oral sex on R.C., and R.C. would ejaculate. R.C. testified that the "first rule at Mike's house was you don't talk about what happens at Mike's house."

¶ 16    On cross-examination, R.C. admitted that at first he did not want to speak to the police about the sexual activity, because he did not believe that defendant did anything wrong. At the time of the first police interview, R.C. was 17 years old and still did not understand that what defendant did was wrong. However, he testified, he never said anything untrue to the police or in court.

¶ 17    Detective Paul Warner testified that defendant consented to videotaping his statement. A redacted portion of the tape, which included only those portions of the interview relating to R.C., was admitted into evidence. On the videotape, defendant admitted to the mutual masturbation, mutual oral sex, and mutual ejaculation activities with R.C. Defendant stated that the abuse started when R.C. was around 14 years old. Defendant admitted that the abuse occurred in his apartment and in a car, which was consistent with R.C.'s statements. He also admitted his rule was to not tell anyone what happened at his house.

¶ 18    The redacted video, which included 16 clips, was played in its entirety for the jury. During the testimony of Sergeant Timothy Jonites, Sergeant Jonites stated that defendant

volunteered that he was a friend of R.C.'s parents and that he felt that he had betrayed their trust. Defendant also told Sergeant Jonites that he was responsible for his actions because he was the adult in the situation with R.C. These statements appeared in clips 14, 15, and 16 of the video. Also in those clips, defendant stated that he knew that "these people," referring to R.C.'s parents, would not be happy, because "they trusted" him and he "let them down." Defendant acknowledged that he should not have "allowed" these events to occur, because he was "the adult." Defendant stated that he "should have stopped" the abuse but did not.

¶ 19    The State rested its case and defendant moved for a directed verdict. In that motion, defense counsel argued that R.C. did not "testify as to a position of trust and authority" and that this was key, since the State limited its charges in the indictment to "trust." That motion was denied. The defense rested.

¶ 20    During the jury instruction conference, the State submitted Illinois Pattern Jury Instructions, Criminal, No. 11.55 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 11.55), which provided the instruction on criminal sexual assault:

> "A person commits the offense of criminal sexual assault when he commits an act of sexual penetration with the victim who was at least 13 years of age but under 18 years of age when the act is committed, and he is 17 years of age or older and holds a position of trust, authority, or supervision in relation to the victim."

¶ 21    Defense counsel objected, arguing that the indictment included only a "position of trust" and did not mention the term authority or supervision. The instruction was given over objection as the court noted that *People v. Kaminski*, 246 Ill. App. 3d 77 (1993), did not so narrowly construe the three terms and that the instruction followed the statute under which defendant was charged. Defense counsel lodged the same objection to Illinois Pattern Jury Instructions, Criminal, No. 11.56 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 11.56), which provided the propositions that the State must prove to sustain a charge of criminal sexual assault and which included the terms "authority, or supervision." Again, the instruction was given over the objection. The same occurred for Illinois Pattern Jury Instructions, Criminal, No. 11.62B (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 11.62B), which applied to aggravated criminal sexual abuse "when a defendant is a family member or in a position of responsibility or trust."

¶ 22    Defendant then tendered Illinois Pattern Jury Instructions, Criminal, No. 11.61(d)(2) (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 11.61(d)(2)), an instruction on aggravated criminal sexual abuse as a lesser included offense of criminal sexual assault:

> "A person commits the offense of aggravated criminal sexual abuse when he commits an act of sexual penetration with a victim who is at least 13 years of age but under 17 years of age when the act is committed and he is at least 5 years older than the victim."

¶ 23    The trial court refused the instruction, finding that the case cited in support by the defense (*People v. Lawrence*, 254 Ill. App. 3d 601 (1993)) was distinguishable on its facts and that aggravated criminal sexual abuse was not a lesser included offense.

¶ 24    During closing arguments, the State argued that defendant held a position of trust by virtue of his long-standing friendship with the family and because R.C. often spent the night in defendant's care, with defendant providing him with food, medicine, supervision, and

assistance with his homework. Defense counsel argued that, even though defendant said that he "blew the trust" of the family, it was "not that kind of trust." It was a moral trust, not a legal trust. In rebuttal, the State argued that, while the evidence showed that defendant held a position of all three–trust, authority, and supervision–any one position was sufficient to convict under the law.

¶ 25    The jury found defendant guilty of all 20 counts. Defendant filed a motion for a new trial, arguing in part that the jury instructions incorrectly included the terms "authority" and "supervision" and that the trial court improperly refused the instruction on aggravated criminal sexual abuse as a lesser included offense. The trial court reiterated that it did not believe that defendant's proposed instruction was on a lesser included offense of criminal sexual assault, and it rejected all of defendant's other contentions. The trial court concluded that there was no basis to warrant a new trial. Defendant timely appealed after sentencing.

¶ 26                              B. Trials Involving T.S. and A.W.

¶ 27    The charges relating to T.S. and A.W. stem from a 152-count indictment for multiple sexual offenses involving multiple victims, filed in trial court case number 07-CF-4810. Appeal No. 2-10-0303 involves defendant's trial and convictions related to T.S.: 5 counts (counts VII through XI) of predatory criminal sexual assault of a child for knowingly placing his mouth on the penis of T.S. (720 ILCS 5/12-14.1(a)(1) (West 2006)); 5 counts (counts XVII through XXI) of predatory criminal sexual assault of a child for knowingly placing his penis in the mouth of T.S.; 10 counts of criminal sexual assault (720 ILCS 5/12-13(a)(4) (West 2006)) for committing an act of sexual penetration while in a position of trust when he knowingly placed his mouth on the penis of T.S. (counts XXVII through XXIX, XLVII, XLVIII), placed his penis in the mouth of T.S. (counts XLIV through XLVI, LXIV, LXV); eight counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(f) (West 2006)) for placing his hand on the penis of T.S. while in a position of trust and for the sexual gratification of defendant (counts CXXXIII, CXXXIV, CXXXVII, CXXXVIII) and placing his penis in the hand of T.S. while in a position of trust and for the sexual gratification of defendant (counts CXXXV, CXXXVI, CXXXIX, CXL). Appeal No. 2-11-0204 involves defendant's trial and convictions related to A.W.: four counts of criminal sexual assault (720 ILCS 5/12-13(a)(4) (West 2006)) for committing an act of sexual penetration while in a position of trust when he knowingly placed his penis in the mouth of A.W. (counts LXVII, LXVIII) and placing his mouth on the penis of A.W. (counts LXXXVII, LXXXVIII); and four counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(f) (West 2006)) for knowingly placing his penis in the hand of A.W. while in a position of trust and for the sexual gratification of defendant (counts CXLV, CXLVI) and for knowingly placing his hand on the penis of A.W. while in a position of trust and for the sexual gratification of defendant (counts CXLVII, CXLVIII).

¶ 28    On October 21, 2008, defendant filed a motion for a bill of particulars. In that motion, defendant requested more specific facts to support the indictment's allegation that he held "a position of trust, authority, or supervision in relation to the victim," because the indictment was void of "facts or evidence of any trust[,] authority, or supervision." On July

13, 2009, defendant filed a motion to compel the State to respond to his motion for a bill of particulars. On August 6, 2009, the State filed its response. Generally, the State said that defendant was a friend of several of the victims' parents, as reflected in previously tendered discovery, and that there were no written agreements or contracts between defendant and any victim or parent. Each victim, the State provided, spent days and nights at defendant's apartment, played games on his computer, and watched movies or played video games, and defendant provided them with food and drink during the visits. T.S. met defendant through his aunt, who worked with defendant. In 2002, T.S. began going to defendant's apartment and playing video games. Eventually, T.S. spent nights at defendant's apartment. Approximately June 7, 2007, T.S. stayed with defendant and then lived there through the end of August 2007. T.S.'s mother knew when T.S. was at defendant's apartment and she knew that defendant was responsible for watching him. A.W. met defendant when he was about 12 years old, and he spent at least nine nights at defendant's residence. Defendant was the responsible adult when A.W. was with him. A.W.'s parents were aware when he spent the night at defendant's home and they knew that defendant was the adult watching over him.

¶ 29    On January 27, 2010, the State filed a supplemental disclosure to defendant regarding A.W. The disclosure stated that A.W. and his mother K.W. had informed the State that A.W. stayed at defendant's home and was returned home by either defendant, A.W.'s parents, or R.C.'s parents. Defendant supplied A.W.'s meals when he was there. A.W. went shopping with defendant and assisted defendant when he moved from an upstairs apartment to a downstairs apartment. K.W. gave defendant instructions on A.W.'s care, including on providing prescription medication, and defendant followed the instructions. A.W. told the State that he performed chores while at defendant's home, including cleaning up dishes. Defendant provided food, usually pizza, and took A.W. to see a movie. Defendant provided A.W. with his medication when he stayed the night. A.W. stated that defendant paid him to babysit the children of defendant's friends on a couple of occasions.

¶ 30                              1. Trial Involving T.S.

¶ 31    On January 25, 2010, defense counsel moved to dismiss the indictment as to T.S., arguing that there was no evidence to support the element of a position of trust. The court denied the motion. The next day, defendant's trial began on the charges pertaining to T.S.

¶ 32    C.W., the mother of T.S., testified that she first met defendant around 1999 or 2000 through a family friend named Lisa, who worked with defendant. C.W. and her children lived in Twin Lakes, Wisconsin. After first meeting defendant at Lisa's house, C.W. began socializing with defendant approximately weekly. Defendant attended family events, such as birthdays and Thanksgiving. C.W.'s children, T.S. and S.S., grew to like defendant and spent time with him regularly. T.S. referred to defendant as "Uncle Mike" and spent time at defendant's residence in Vernon Hills beginning in 2001 or 2002, when T.S. was about age 12. The overnight visits occurred over weekends, usually Friday night through Sunday, approximately once or twice a month. The visits increased to every weekend over time. During school breaks, T.S. would spend a week or two with defendant. These visits continued until T.S. was about 16 or 17 years old.

¶ 33    C.W. testified that defendant would drive from Vernon Hills to Twin Lakes to pick up T.S. for these visits. C.W. gave defendant written instructions on T.S.'s medications, such as the dosages and when the medications should be given. She also gave him notes indicating that she was T.S.'s mother and that defendant was his caretaker so that, in case of an emergency, the hospital would not give defendant problems if T.S. needed any medical attention. C.W. testified that defendant took T.S. places, such as Wisconsin Dells, Six Flags, movies, and sporting events. She further testified that defendant bought T.S. gifts, such as clothes, iPods, and shoes. C.W. identified People's Exhibit No. 1, a photograph of T.S. with defendant when T.S. was 12 years old. The exhibit was admitted over defendant's objection. On cross-examination, C.W. admitted that defendant was a close family friend but not T.S.'s teacher, paid babysitter, coach, Boy Scout leader, minister, or healthcare provider. She admitted that she did not give defendant legal guardianship and did not have a formal contract with him to care for T.S.

¶ 34    T.S. testified that he first met defendant when he was 11 years old, while at his "Aunt Lisa's" house. Lisa was the sister of T.S.'s mother's boyfriend. After the first meeting, T.S. saw defendant at family functions, such as holidays and birthdays. He also started to spend weekends and time off of school with defendant. Defendant often picked T.S. up in Twin Lakes for these overnight visits. Defendant lived in an apartment on the second floor when T.S. first started spending nights with him. At one point, he helped defendant move to a first-floor apartment. According to T.S., the weekly overnight visits continued from age 11 through age 16. He typically stayed from Friday through Sunday and slept on the floor in the living room, on a couch, or in defendant's bed. T.S. testified that, during the school year, he brought homework with him to defendant's home, and defendant assisted him with his homework. T.S. testified that defendant often did the homework for him by writing the answers down and having T.S. copy them onto his worksheets. T.S. testified that, when at defendant's home, defendant was the adult taking care of him. T.S. stated that defendant bought him clothing and electronics and took him places, such as the mall, friends' homes, sporting events, and movies.

¶ 35    T.S. stated that, when he first started staying at defendant's home, he woke up to defendant touching his penis using his mouth and hands. T.S. testified that defendant also asked him to touch defendant's penis by moving his hands up and down it. T.S. testified that defendant used his mouth and hands on T.S.'s penis from the time T.S. was 11 years old until he was about 16. Defendant told T.S. that it was "about time I get something because you're always getting everything you want," referring to the various gifts and outings he provided T.S. T.S. testified that he spent the summer of 2007 at defendant's apartment; T.S. was 16 years old at that time. During that summer, defendant put his hands and mouth on T.S.'s penis and had T.S. put his mouth and hands on defendant's penis. T.S. testified that he referred to defendant as "Uncle Mike," and he sometimes did chores for him while at his home.

¶ 36    On cross-examination, T.S. admitted that he was in a hospital for six months beginning around January 2005. During that six-month period, defendant came to visit T.S. but T.S. did not spend the night at defendant's apartment. Also during a four-month period from September 2004 through January 2005 there were no overnight visits because defendant was

caring for his mother. Therefore, T.S. admitted, there was no sexual contact from September 2004 through June 2005. On redirect, T.S. stated that the sexual conduct began when he was 11 and continued through age 16, with the exception of the period between September 2004 and June 2005. The State introduced an exhibit that was a plaque that defendant made for T.S. commemorating his first hockey game with defendant. The date of the plaque was around T.S.'s twelfth birthday, which T.S. testified was around the time the abuse began.

¶ 37     Michael Keller, a detective with the Lake County sheriff's office, testified that he arrested defendant on November 2, 2007, and interviewed him along with Detective Warner. The interview was videotaped, with defendant's written consent. Detective Keller first questioned defendant regarding his relationship with T.S. Defendant told him that he was a very good friend of T.S.'s mother and that, if he were to ask C.W., she would describe defendant as somewhat of a father or surrogate father to T.S. Defendant himself described T.S. as being like a nephew to him. Defendant admitted that the "massaging" of each other's penises started when T.S. was around age 12 or 13. Defendant knew that he should not have done so, but he would massage T.S.'s penis and his buttocks and other body parts and ask T.S. to do the same for him. Defendant admitted to Detective Keller that there was mutual oral sex, meaning defendant used his mouth on T.S.'s penis and T.S. used his mouth on defendant's penis. Defendant stated that this occurred about a dozen times, but defendant was unsure and would not argue if Detective Keller said that it occurred 40 or 50 times. Defendant denied that it occurred more than 100 times.

¶ 38     The State introduced People's Exhibit No. 7, the video of defendant's interview, redacted to show only portions relating to T.S. , and played it for the jury. The content of the interview was consistent with Detective Keller's testimony. Defendant admitted that he began massaging T.S.'s penis when T.S. was 12 or 13, and that T.S. massaged defendant's penis in return. He admitted that he and T.S. were erect sometimes during this activity. Defendant admitted that mutual oral sex occurred and that they both ejaculated but never in each other's mouths. T.S. ejaculated less often than defendant. Defendant admitted that T.S. attempted to anally penetrate him one time but that defendant stopped it. He denied anally penetrating T.S. on any occasion. Defendant stated that he thought the sexual contact occurred about a dozen times over the "last couple years." However, upon further questioning, defendant said that, over the four years of contact with T.S., the sexual contact occurred fewer than 100 times but that he would not argue with estimating the number of times at 40 or 50. Defendant admitted that he was a very good friend of T.S.'s mother and Aunt Lisa and that T.S.'s mother would likely describe defendant as a father or surrogate father to T.S. Defendant himself described T.S. as a nephew. He admitted that he bought things for T.S., even before the sexual contact began.

¶ 39     Detective Warner testified that the video accurately portrayed the interview of defendant that he conducted with Detective Keller. The parties stipulated that Lake County Sheriff's Deputy Manis would testify that he interviewed T.S. on November 1, 2007, and that T.S. said that, over the past four years, beginning approximately when he was in seventh grade, he was abused by defendant.

¶ 40     During the conference on jury instructions, defense counsel proffered IPI Criminal 4th No. 11.62A and IPI Criminal 4th No. 11.61(d)(2), on the lesser included offense of

-10-

aggravated criminal sexual abuse. The trial court refused the instructions, finding that aggravated criminal sexual abuse was not a lesser included offense of criminal sexual assault. The jury returned guilty verdicts on all the counts.

¶ 41                    2. Trial Involving A.W.

¶ 42    On February 8, 2010, defendant moved to dismiss the indictment as to counts LXVII, LXVIII, LXXXVII, AND LXXXVIII and CXLV through CXLVIII, stating that there were no facts elicited during the grand jury hearing to support a position of trust as to A.W. The motion was denied, and trial commenced the same day.

¶ 43    K.W., the mother of A.W., testified that A.W. took prescription medications for attention deficit and hyperactivity disorder and attended special education classes at school because of his condition. She first met defendant when A.W. was in middle school. She met him through the parents of A.W.'s friend, R.C. K.W. had socialized with defendant and the parents of R.C. on some occasions. R.C. and A.W. were best friends, and A.W. started spending time with defendant through his time with R.C. A.W. started going to defendant's home sometime when he was in middle school and he continued until he was approximately 17 years old. K.W. or her husband drove A.W. to defendant's home. The parents of R.C. also took A.W. to defendant's home at times. Defendant sometimes picked A.W. up. K.W. estimated that over the years A.W. went to defendant's home approximately 12 to 15 times. A.W. first spent the night at defendant's home in seventh grade. She estimated that A.W. spent the night at defendant's home approximately 7 to 10 times. K.W. gave A.W.'s medication to defendant with instructions, and defendant followed the instructions. She knew that when A.W. was with defendant he sometimes helped defendant clean and grocery shop. Defendant fed A.W. when he was there, and K.W. trusted defendant with A.W.'s care. She knew defendant to be the only adult with A.W. when he stayed with defendant. On cross-examination, K.W. admitted that defendant was not a paid babysitter, clergyman, coach, teacher, or troop leader.

¶ 44    A.W. testified that he first met defendant at a pool party at R.C.'s home for R.C.'s birthday. R.C. referred to defendant as "Uncle Mike," and defendant introduced himself to A.W. Defendant told A.W. that he was going to dinner with R.C. and some family and that A.W. was welcome to come. A.W. and his parents had dinner with defendant and R.C.'s family one time. A.W. went to defendant's home about a day or two after the pool party. A.W. went to defendant's home about every two weeks, if not more. R.C.'s parents or A.W.'s father took him to defendant's home. He and R.C. watched movies and played video games while at defendant's home. These visits started when A.W. was 15 and continued until he was about 17. While there, defendant had the boys clean and do some chores. When defendant told him to do something, A.W. followed the instructions. While he was with defendant, defendant provided A.W. with his medications. Defendant took A.W. to see movies and out to eat, and defendant always paid.

¶ 45    Around age 15 or 16, A.W. was in defendant's living room when defendant asked him who would like to make defendant happy. A.W. asked defendant what he meant. Defendant took A.W. into the bedroom, told him to sit on the bed, and asked him if he wanted to make

defendant happy. A.W. said sure, and defendant asked if he ever "came" before. A.W. said no and asked what that meant. Defendant took his pants off and had A.W. touch defendant's penis. Defendant asked A.W. to touch it and to move it up and down to make him come, but defendant did not ejaculate. The next time this occurred, defendant ejaculated. Defendant then asked A.W. to get a napkin or paper towel to wipe his penis. Defendant told A.W. to put the towel in the toilet. A.W. followed defendant's instructions. A.W. testified that defendant had him touch his penis at least five times.

¶ 46    When asked if defendant ever touched A.W.'s penis, A.W. said yes and that it happened so many times that he could not describe how it happened. The first time it happened, A.W. did not ejaculate. A.W. testified that he had never ejaculated before and was too nervous during the first incident. The next time A.W. was at defendant's home, defendant touched his penis until A.W. ejaculated. A.W. stated that this happened more times than he could remember but certainly more than two times.

¶ 47    A.W. testified that, when they were in the bedroom, defendant asked A.W. if he wanted to make defendant "more happy." Defendant asked A.W. to use his mouth on defendant's penis, and A.W. followed defendant's request. A.W. said that he put his mouth on defendant's penis on more than two occasions. He also stated that defendant placed his mouth on A.W.'s penis on three occasions. A.W. testified that most of these sexual contacts occurred in the apartments, on both the first and second floors, that defendant occupied in Vernon Hills. Defendant also touched A.W.'s penis in the car when defendant was driving or when he parked near A.W.'s home. Defendant had a rule that whatever happened at defendant's home stayed at defendant's home. A.W. followed the rule. A.W.'s last sexual contact with defendant occurred about three or four months prior to defendant's arrest in the fall of 2007. A.W. testified that, when he was at defendant's home, defendant was in charge of him.

¶ 48    On cross-examination, A.W. admitted that he did not refer to defendant as "Uncle Mike," and did not think of defendant in that way. He knew defendant only through R.C. Defendant never took A.W. to school but occasionally dropped him off at the grocery store where he worked. He admitted that defendant was not his legal guardian, teacher, formal counselor, minister, hospital worker, or paid babysitter. However, A.W. testified that he did occasionally ask defendant for advice and that defendant provided him with medication upon his parents' instructions. A.W. admitted that defendant was not a friend of A.W.'s family. On redirect, A.W. testified that he trusted defendant and believed defendant to be in charge of him when he was at defendant's home.

¶ 49    Detective Warner testified that, when he and Detective Keller interviewed defendant after his arrest, defendant told him that he met A.W. through the family of R.C. Defendant admitted that he had sexual contact with A.W., including mutual oral sex, meaning that defendant used his mouth on A.W.'s penis, and A.W. used his mouth on defendant's penis. Defendant also admitted to mutual masturbation, meaning that defendant used his hand to rub A.W.'s penis, and A.W. used his hand to rub defendant's penis. Defendant stated that the sexual contact began when A.W. was about 15 and continued until A.W. was 16. Defendant knew that A.W. was in high school, because A.W. was a coach or manager of one of the freshman-sophomore sports teams. Defendant stated that the sex acts occurred in his

apartments in Vernon Hills, both the upstairs and downstairs apartments. He also admitted that the sex acts sometimes occurred in a car. Defendant admitted that he told A.W. that the first rule in his house, based on the movie "Fight Club," was that you do not discuss what happens at defendant's house. Defendant admitted that he knew that what he did was wrong.

¶ 50　　Detective Keller testified consistently with Detective Warner's testimony and the content of the video. Additionally, Detective Keller confirmed that, although edited out of the video, he asked defendant what he meant by the terms "manual" and "oral" sex. Defendant told him that manual meant that he used his hand on A.W.'s penis and vice versa. Defendant told him that oral sex meant that he used his mouth on A.W.'s penis and vice versa.

¶ 51　　Sergeant Jonites testified regarding a portion of the interview that he participated in, marked on the video as clips 12 and 13, which we discuss later. Sergeant Jonites described defendant's demeanor during the interview as "very relaxed, very laid back."

¶ 52　　The video of the interview, redacted to show only portions relating to A.W. (People's Exhibit No. 3), and transcripts of the video (People's Exhibits No. 4 and No. 5) were entered into evidence. The video was played for the jury. In the video, defendant answered the question, "did they kind of think of you also as a father figure?" with "as an uncle." He could not recall when he last had sexual contact with A.W. He admitted that the incidents occurred in his apartments and sometimes in his car. Defendant explained his rule of never telling anyone what happens at his home. He admitted that the sexual contact with A.W. began when A.W. was about 15. Defendant estimated that he had sexual contact with A.W. on "maybe 15 to 20" occasions. In clip 12, defendant stated that "these people they're not going to be happy" and that "they trusted me, I let them down. I understand that." Defendant continued, "It wasn't, like I said, anything I cold and calculated did. The situation happened and I should have said no. I should have stopped things." In clip 13, defendant acknowledged that he "created the situation," that he was the "adult who should have said no to things" but did not, and that he "let them escalate."

¶ 53　　The State rested, and defendant rested without presenting any evidence.

¶ 54　　During the jury instruction conference, defendant requested IPI Criminal 4th No. 11.62A and IPI Criminal 4th No. 11.61(d)(2). The trial court denied those instructions, finding that aggravated criminal sexual abuse was not a lesser included offense of criminal sexual assault. The trial court, like in the previous trials of R.C. and T.S., determined that the offenses contained different age elements despite defendant's argument that the offenses were the same but for the element of a position of trust, authority, or supervision. The jury returned guilty verdicts on all counts, and the trial court denied defendant's posttrial motions.

¶ 55　　　　　　　　　　　　II. ANALYSIS

¶ 56　　　　　　　　A. Lesser Included Offense Instruction

¶ 57　　Defendant first argues that he was denied fair trials when the trial court refused to instruct the juries on aggravated criminal sexual abuse as a lesser included offense of criminal sexual assault. Defendant argues that there was no evidence that he held a position of trust, authority, or supervision as a teacher, counselor, coach, troop leader, healthcare provider, or physician for any of the victims. He also argues that there was no evidence that he was ever

-13-

paid for doing any service that related to the victims. Defendant argues that, even if there had been evidence presented, the question of whether he misused that position in the commission of the offenses was a question for the juries, and, when the court declined to provide the lesser included offense instructions, it prevented the juries from performing this critical task and effectively directed verdicts for the State.[1] While the State essentially agrees that the court erred in finding that aggravated criminal sexual abuse was not a lesser included offense, it argues that the court did not abuse its discretion in refusing the instructions where there was no evidence to support tendering the instructions and that we should affirm on that basis. We agree with the State.

¶ 58    When determining whether an uncharged offense is a lesser included offense of a charged crime, we analyze under the charging-instrument approach. *People v. Miller*, 238 Ill. 2d 161, 173 (2010) (discussing various situations and methods of analysis and endorsing the charging-instrument approach when dealing with an uncharged crime). "Under the charging instrument approach, the court looks to the charging instrument to see whether the description of the greater offense contains a 'broad foundation' or 'main outline' of the lesser offense." *Id.* at 166 (quoting *People v. Kolton*, 219 Ill. 2d 353, 361 (2006)). The indictment need not explicitly state all of the elements of the lesser offense as long as any missing element can be reasonably inferred from the indictment's allegations. *Id.* at 166-67. Whether a particular offense is a lesser included one is a decision made on a case-by-case basis using the indictment's factual description of the charged offense. *Id.* at 167. Here, the only difference between the proffered lesser included offense and the charged offense was the element of a position of trust, authority, or supervision, and the State so much as concedes that this meets the charging-instrument test.

¶ 59    However, "an inquiry into whether a defendant may be convicted of an uncharged offense is a two-tiered process." *Kolton*, 219 Ill. 2d at 361. If it is determined that a particular offense is a lesser included offense of a charged crime, the court must then examine the evidence adduced at trial to decide whether the evidence rationally supports a conviction of the lesser offense. *Id.* Here, defendant argues in each brief that, since the juries heard evidence that defendant was not a paid babysitter, scout leader, coach, minister, or person of any other such position, there was at least some evidence that he did not take advantage of any position of trust relative to the victims. We disagree with defendant that any rational trier of fact could have convicted him of the lesser included offense simply because he was not a paid babysitter, coach, minister, scout leader, or person of any such position.

¶ 60    The identification of a lesser included offense does not automatically give rise to a correlative right to have the jury instructed on it. *People v. Novak*, 163 Ill. 2d 93, 108 (1994). Rather, a defendant is entitled to the instruction only if the evidence would permit a jury

---

[1]Regarding the trial involving T.S., the State argues that defendant forfeited this argument. Based upon our review of the record, defendant sufficiently raised this issue in the trial court. Additionally, we deny the State's motion to strike the claim of ineffective assistance of counsel that defendant raised in his reply brief in response to the State's forfeiture argument. However, because we do not deem defendant's argument forfeited, we need not address the ineffective-assistance-of-counsel claim.

rationally to find the defendant guilty of the lesser included offense and acquit him of the greater offense. *Id.* This evidentiary requirement is usually satisfied by the presentation of conflicting testimony on the element that distinguishes the greater offense from the lesser offense. *Id.* Where the testimony is not conflicting, this requirement can be satisfied if the conclusion as to the lesser offense can fairly be inferred from the evidence presented. *Id.* The amount of evidence necessary to meet this factual requirement has been described as " 'any,' 'some,' 'slight,' or 'very slight.' " *Id.* at 109. The trial court has the discretion to decide whether an instruction is to be given. *People v. Crane*, 145 Ill. 2d 520, 526 (1991). If there is evidence supporting the lesser included offense instruction, it is an abuse of discretion for the trial court to refuse it. *Id.* While the trial court here in all three matters based its refusal on its finding that aggravated criminal sexual abuse was not a lesser included offense of criminal sexual assault under *Lawrence*, we may affirm the trial court's decisions on any basis that is supported by the record. *People v. Mulvey*, 366 Ill. App. 3d 701, 711 (2006).

¶ 61     We cannot hold that the trial court abused its discretion in refusing the lesser included offense instruction where there was no evidence, even slight evidence, to support a jury rationally finding defendant guilty only of the lesser offense. Contrary to defendant's unsupported contention that he was entitled to the instruction because there was no evidence that he was paid for any services or held a titled position in relation to the victims, there is no such requirement under the criminal sexual assault statute. In *People v. Reynolds*, 294 Ill. App. 3d 58, 65 (1997), the defendant argued that there was insufficient evidence to sustain his conviction of criminal sexual assault where the State failed to establish that he held a position of trust, authority, or supervision, because he did not hold a parental relationship with the victim and was not a teacher, scout leader, or babysitter. The appellate court rejected the defendant's argument, explaining that the terms "trust," "authority," and "supervision" must be given their plain and ordinary meanings. *Id.* While the appellate court agreed that the defendant's position as a publicly elected official did not alone create a position of trust, authority, or supervision, the evidence at trial supported that such a position existed in relation to the victim. *Id.* at 66. The appellate court noted that the victim had worked as a volunteer on the defendant's campaign for three weeks, that the defendant sometimes described his relationship to the victim as that of a "mentor," that he arranged for the victim to attend a private school, that the school would sometimes call the defendant when the victim had problems, that the defendant counseled the victim not to drop out of school, and that the defendant gave money to the victim at times. *Id.*

¶ 62     Similarly, in *Secor*, the victim's family had known the defendant for 10 years prior to the incident of abuse. *Secor*, 279 Ill. App. 3d at 392. The victim had spent the night at the defendant's home approximately six times, and the defendant's children had spent the night at the victim's home about the same number of times. *Id.* The defendant argued that the State failed to prove that he held a position of trust, authority, or supervision over the victim when the evidence showed only that the victim was in his home. *Id.* The appellate court rejected this argument, finding that the evidence established the necessary relationship where the defendant functioned as a babysitter or chaperone when he had the victim in his home, drove him to the video store, and told him when to go to bed. *Id.* at 394. The court also noted that it could not "ignore the fact that the families of the defendant and the victim had been friends

for 10 years, a circumstance likely to generate mutual trust," which was demonstrated on the occasions when the children slept at each other's homes. *Id.*

¶ 63     Likewise, in the case of R.C., the evidence presented at trial did not support a finding that defendant did not occupy a position of trust, supervision, or authority. As in *Secor,* R.C.'s parents testified that they had been a friend of defendant's since before R.C.'s birth, that defendant had known and interacted with R.C. since his birth, and that they trusted defendant with R.C. on many occasions over the course of the nearly 20-year friendship, even listing defendant as an emergency contact at R.C.'s school. During those years when R.C. was in defendant's care, defendant provided R.C. with food, his epilepsy medication, assistance with his homework, entertainment such as video games or movies, and transportation to church or other places as needed. J.C. testified that, over the years, she observed defendant chastising R.C. for talking back to his parents or not helping his mother with chores and that R.C. listened to defendant and followed his instructions. R.C. testified that he considered defendant "in charge" when he stayed at defendant's home and that he referred to defendant as "Uncle Mike." In addition, when discussing the abuse of R.C., defendant himself stated to police that "they trusted me" and that he "let them down." Under these facts, which we find even more compelling than the facts of *Reynolds* and *Secor*, we cannot say that the trial court abused its discretion in refusing to instruct the jury on the lesser included offense where the evidence on the distinguishing element of the greater offense was undisputed. Further, the opposite conclusion could not be fairly inferred from the fact that no evidence suggested that defendant was ever paid or held a titled position in relation to R.C. Accordingly, we find that defendant was not entitled to the lesser included offense instruction where no evidence existed to support it and no fair inference could be made on the issue.

¶ 64     In the case of T.S., C.W. testified that she knew defendant through a family friend and had known him since 1999 or 2000 and began socializing with him on a weekly basis. She testified that T.S. referred to defendant as "Uncle Mike" and that T.S. grew to like defendant and spent weekends with him on a regular basis. T.S. spent weekends with defendant approximately twice a month, beginning around age 12 and continuing until he was 17. C.W. testified that defendant followed her written instructions on T.S.'s medications and provided T.S. with his medications during those overnight visits. Defendant bought T.S. clothes and electronics and took him places such as to the movies. T.S. testified consistently with his mother. He further testified that defendant helped him with his homework over those weekends and that he believed that defendant was in charge of him. Additionally, according to the testimony of the detectives and the video of defendant's confession, defendant admitted that he was a very good friend of C.W.'s and he described T.S. as being like a nephew to him. Defendant also admitted that if C.W. were asked she would likely describe defendant as a father or surrogate father to T.S. Like in the case of R.C., under *Reynolds* and *Secor*, we cannot say that the trial court abused its discretion in refusing to instruct the jury on the lesser included offense where the evidentiary requirement to support it was not satisfied. Under the facts presented at the trial involving T.S., the opposite conclusion on the element of a position of trust, authority, or supervision could not be fairly inferred from the fact that there was no evidence that defendant was paid or held a titled position in relation to T.S. Like in *Secor*, we cannot simply ignore the evidence of a longstanding family

friendship where defendant admitted he was like a father or uncle to T.S.

¶ 65    In the case of A.W., the relationship between defendant and A.W.'s parents was somewhat tenuous when compared to defendant and the families of T.S. and R.C. However, the evidence still demonstrated that the relationship between A.W. and defendant built up over time and was one of trust, authority, or supervision. A.W. and R.C. were best friends, and A.W. met defendant while at R.C.'s party. He knew R.C. to refer to defendant as his "uncle." A.W. spent time with defendant over the course of two years. He went to defendant's home on several overnight visits. K.W. testified that she gave defendant instructions on A.W.'s medications and that defendant followed her instructions and provided the proper medications to A.W. She knew defendant to be the only adult with A.W. when he spent time there. She trusted him with A.W.'s care and knew that A.W. sometimes helped defendant with chores or grocery shopping. A.W. testified that he spent time with defendant about every two weeks or more. He and R.C. watched movies and played video games at defendant's home and helped defendant with chores when asked. A.W. testified that, when defendant asked him to do something, he did it. He also testified that defendant provided him with his medications and food and always paid when they went to a movie or out to eat. Further, defendant admitted on the video that he thought that "they," referring in part to A.W., thought of him as an "uncle." Defendant also stated on the video that "these people," referring to the affected families, would not be "happy" because they "trusted" him and he "let them down." Defendant acknowledged that he was the adult who created the situation and let things escalate. While A.W. might not have referred to defendant as "Uncle Mike" like R.C. or T.S. and he testified that he did not think of defendant as an uncle, A.W. did testify that he asked defendant for advice at times, trusted defendant, and considered defendant "in charge" of him when he was at his home.

¶ 66    Like in *Reynolds* and *Secor*, we cannot ignore the evidence of the relationship that defendant created with A.W., which he acknowledged was of the nature of an uncle-nephew relationship. There was no evidence contradicting the fact that defendant held a position of trust, authority, or supervision such that a rational jury could have come to an opposite conclusion. Thus, we cannot say that the trial court abused its discretion in refusing to instruct the jury on the lesser included offense where the evidentiary requirement to support it was not satisfied. Under the facts presented at the trial involving A.W., the opposite conclusion on the element of a position of trust, supervision or authority could not be fairly inferred from the fact that there was no evidence that defendant was paid or held a titled position in relation to A.W.

¶ 67                    B. Expansion of Charges Through Jury Instructions

¶ 68    Defendant next argues that he was denied a fair trial in all three matters where all of the charges alleging a position of trust were expanded in the jury instructions to include a position of authority or supervision and where the aggravated criminal sexual abuse charges alleging that the abuse was performed to gratify defendant's sexual desires were expanded to include the gratification of the victim as well. We reject both arguments.

¶ 69    We first address defendant's argument regarding the expansion of the charges by

including the terms "supervision" and "authority" in the instructions. Defendant offered modified instructions in each trial to include only the term "trust," which the trial court denied every time. Generally, pattern jury instructions are to be used unless the court determines that a particular instruction does not accurately state the law. *People v. Nutall*, 312 Ill. App. 3d 620, 633 (2000). "In reviewing the adequacy of instructions, the [appellate] court must consider the jury instructions as a whole to determine whether they fully and fairly cover the law." *Id.* The function of jury instructions is to convey to the jury the correct principles of law applicable to the evidence so the jury can apply the proper legal principles to the facts and arrive at a proper conclusion based on the law and the evidence. *Id.* If an IPI instruction does not state the law, the proffered instruction given on that subject should be simple, brief, impartial, and free from argument. *Id.* The decision to give or refuse a non-IPI instruction is a matter within the sound discretion of the trial court. *Id.* An abuse of discretion occurs in refusing to give a non-IPI instruction where there is no IPI instruction applicable to the subject and the jury was left to deliberate without proper instructions. *Id.* Refusal to give a non-IPI instruction does not constitute an abuse of discretion if there is an applicable IPI instruction and/or the essence of the refused instruction is covered by the instruction given. *Id.* The trial court must give a non-IPI instruction if refusing to give a non-IPI instruction would result in the jury not being instructed as to a defense theory of the case "which is supported by some evidence." *People v. Ehlert*, 274 Ill. App. 3d 1026, 1037 (1995).

¶ 70    In tendering a modified IPI instruction at the trial involving R.C., defendant argued to the court that the IPI instruction was inappropriate where the indictment charged defendant with having only a "position of trust" and not one of authority or supervision. Defendant made similar arguments in the trials involving T.S. and A.W. We reject this argument given the fact that defendant filed motions for a bill of particulars on this exact issue in all three matters, the State answered those requests, and defendant was therefore sufficiently apprised that the charges followed the form of the statute. In those motions, defendant requested specific facts supporting the State's allegation that defendant held a "position of trust, supervision or authority." Defendant's own motions therefore acknowledged that the indictment's language and citation to the statute under which he was being charged sufficiently apprised him that he was charged with holding a position of authority or supervision, as well as trust. If there was doubt, the State answered defendant's motions with its supporting facts. Further, the facts adduced at the trials supported *all three* terms even though the State needed to establish only one. See 720 ILCS 5/12-13(a)(4) (West 2006) (plain language of statute states "position of trust, authority *or* supervision" (emphasis added)). In the trial involving R.C., the facts supported that, by virtue of his long-standing friendship with R.C. and his family, defendant was trusted by R.C. and his family, defendant supervised R.C. when he spent the night at defendant's home, and R.C. considered defendant "in charge" of him. These facts supported all three terms. Similar facts were adduced in the trials involving T.S. and A.W. In the trial involving T.S., the facts supported that, again by virtue of his long-standing friendship with T.S. and his mother, defendant was trusted by T.S. and his mother, defendant supervised T.S. when T.S. spent numerous weekends with defendant, and T.S. considered defendant in charge of him and referred to him as "Uncle

Mike." Likewise, in the trial involving A.W., the facts supported that A.W. grew to trust defendant through his friendship with R.C. and R.C.'s family, asked defendant for advice, spent numerous weekends with defendant, considered defendant in charge of him, and acknowledged that defendant provided him with food and medicine and paid for outings. In all three trials, defendant admitted that these victims and their families trusted him with the victims, that he "let them down," that he was like an uncle or father figure to them, and that he was the adult who "created the situation." Accordingly, the IPI instruction accurately apprised the juries of the law under which defendant was charged, and the trial court did not abuse its discretion in refusing to modify it.

¶ 71    In so holding, we reject defendant's argument that *Kaminski* should somehow change our decision because *Kaminski* determined that positions of trust, authority, and supervision were somewhat different from each other. In *Kaminski*, the defendant argued that he could not have held a position of supervision where the victim was a one-night guest in his home. *Kaminski*, 246 Ill. App. 3d at 80. This court considered the plain language of the statute and noted that supervise generally meant "superintend, oversee" and that, because the statute contained "trust, authority, *or* supervis[e]," one could occur without another. (Emphasis added.) *Id.* at 81. Our ultimate holding was that acting as a one-night social host fell under the umbrella of "supervision" where the defendant was responsible for the victim for the night, having provided a place to sleep and a blanket for the victim, and turning the heat up after hearing her coughing. *Id.* at 82. Further, we noted that the defendant "would not have had the opportunity to assault the victim sexually had her parents not entrusted her care to defendant" for the night. *Id.* at 83.

¶ 72    Defendant's interpretation of *Kaminski* to support his position is incorrect. In fact, the holding of *Kaminski* only supports the State's argument that the evidence adduced at trial supported all three positions because the victims and their parents testified that they spent not one night, like in *Kaminski*, but numerous nights at defendant's home where he supervised them and exercised authority over them. Further, the victim in *Kaminski* was 17 years old at the time of the offense, which undermines defendant's argument that, because these victims were in high school during some of the abuse, they did not require a babysitter. More importantly, the *Kaminski* decision did not address the jury instruction issue that is present here. It is unclear whether the jury in *Kaminski* was given non-IPI instructions because the indictment alleged a "position of supervision." Based on our discussion of the defendant's argument that a one-time social host did not fall under the umbrella of "position of trust, authority or supervision" (*id.* at 81), it appears that there was no dispute that the defendant was defending against all three. Regardless, we decline to apply defendant's interpretation of the holding in *Kaminski* to such a different set of facts and legal issues as is present in this case.

¶ 73    Regarding defendant's second contention, that the jury instructions improperly expanded the charges in the indictment by stating that defendant's purpose might have been to gratify the victim's sexual desires, we note that defendant did not offer any alternate instruction on this issue in any of the trials. Defendant also did not raise this issue in his posttrial motions. " 'Generally, a defendant forfeits review of any supposed jury instruction error if he does not object to the instruction or offer an alternative at trial and does not raise the issue in a

posttrial motion.' [Citation.]" *People v. Chatman*, 381 Ill. App. 3d 890, 896 (2008). Even if we reviewed this under the plain-error doctrine, defendant's argument would fail because the evidence presented at trial supported the instruction. Specifically, R.C. testified that both he and defendant would ejaculate during various incidents of sexual contact, which included mutual masturbation and mutual oral sex. Similarly, T.S. testified to incidents of mutual masturbation and mutual oral sex with defendant. A.W. also testified to mutual masturbation and mutual oral sex that involved both him and defendant ejaculating at times. Defendant admitted to engaging in mutual masturbation and mutual oral sex with all three victims and stated that everyone ejaculated at one time or another.

¶ 74    While defendant does not attack the indictment on appeal directly, his argument on this issue seems to indicate that the indictment did not sufficiently apprise him of the fact that he might have to defend against arousing or gratifying the victims. Since defendant never attacked the indictment on this issue prior to his appeal, he must show that his defense was prejudiced. See *People v. Cuadrado*, 214 Ill. 2d 79, 87-88 (2005) (holding that the general standard for reviewing an attack on an indictment after commencement of trial requires the defendant to show prejudice). Defendant fails to argue that he was prejudiced, and given that defendant knew the statute under which he was charged and that he admitted to sexual acts leading to mutual ejaculation, we would have rejected this argument. Indeed, our supreme court has upheld an indictment attacked on appeal that alleged aggravated criminal sexual abuse but failed to state that the alleged sexual conduct was " 'for the purpose of sexual gratification or arousal of the victim or the accused.' " See *People v. DiLorenzo*, 169 Ill. 2d 318, 321 (1996) (finding that despite absence of statutory language " 'for the purpose of sexual gratification or arousal of the victim or accused,' " the defendant was not prejudiced where the indictment cited the precise statute he was charged under, he received statements of State witnesses describing the sexual acts complained of, and his defense at trial did not indicate that he was unaware of the charge against him).

¶ 75    Moreover, as to both of defendant's arguments, we find *People v. Maxwell*, 148 Ill. 2d 116, 132-33 (1992), instructive. In *Maxwell*, the defendant objected to the jury being instructed on felony murder under section 9-1(a)(3) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(3) (West 2006) (formerly Ill. Rev. Stat. 1985, ch. 38, ¶ 9-1(a))) where his indictment alleged only murder under sections 9-1(a)(1) and (a)(2) for intentional and knowing theories. *Maxwell*, 148 Ill. 2d at 132-33. The State informed the court prior to jury selection that it would later ask for the jury to be instructed on felony murder, and the court stated that it would give the instruction if the evidence warranted it. *Id.* at 133. At the close of trial and over the defense's objection, the trial court instructed the jury on felony murder, and the jury returned a general verdict against the defendant. *Id.* The supreme court concluded that the indictment need not state the precise statutory theory of the offense of murder and that its standard of review required consideration of whether the variance between the murder charge and the proof and jury instructions caused the defendant prejudice in his preparation for trial and whether the variance would expose him to the risk of double jeopardy. *Id.* at 137. The defendant did not allege that he was denied the opportunity to adequately prepare for and defend against this additional theory of guilt, and the record did not suggest that he was denied such an opportunity. *Id.* The record showed that the defendant was charged with the

underlying felony and made inculpatory statements to police and that the defense possessed that information. *Id.* at 138. While defense counsel objected to the instructions, his basis was only that the indictment did not cite the additional theory of guilt and he did not allege that his defense would be in any way impaired. *Id.* Further, the court noted that there was no threat of double jeopardy. *Id.*

¶ 76        Likewise, in this case, the defense used the statute's language, "position of trust, authority, or supervision" in its own motions for a bill of particulars, knew that the State was proceeding under this language, and never explained how the defense would be impaired by instructing the jury accordingly. There is no evidence that the defense prepared for or conducted its defense at trial unaware of the State's theory of the case against defendant and the nature of the sexual acts alleged. Regarding the forfeited argument as to the language regarding the gratification of the victims, the defense possessed the statements defendant made to the police, indicating mutual masturbation and mutual oral sex, and knew that they would be admitted at trial supporting both theories of abuse against which he would have to defend. We do not see how the variances between the indictment and the jury instructions, under these facts, caused defendant prejudice in his preparation for trial.

¶ 77        The cases that defendant relies upon for support of his argument that the jury instructions expanded the charges against him are distinguishable and thus inapplicable to the case at bar: *People v. Toolate*, 101 Ill. 2d 301 (1984) (the defendant's conviction was reversed where he was not proven guilty of the charged crime (residential burglary with intent to commit rape) and, while he could have been guilty of residential burglary with intent to commit theft, he was not charged with burglary with intent to commit theft); *People v. Payne*, 194 Ill. App. 3d 238 (1990) (the defendant's conviction was reversed where immediately prior to trial the State amended the indictment to charge him with a different specific-intent crime, the jury was not provided with instructions on the intent required, and the State failed to prove the intent element beyond a reasonable doubt); *People v. Lemcke*, 80 Ill. App. 3d 298 (1980) (the defendant, charged with indecent liberties with the intent to arouse or satisfy his sexual desires, was given a new trial where the trial court barred him from testifying directly about his mental state and where the appellate court *sua sponte* noted that defense counsel provided ineffective assistance when he tendered a jury instruction that contained the intent to arouse or gratify the victim's sexual desires but there was no evidence to support that instruction).

¶ 78        This case does not present the same errors that occurred in *Payne*, such as the jury not being instructed on an element of the offense, the State failing to prove an element of the offense, and the unjust last-minute indictment amendment that changed the entire offense for which the defendant was to be tried. *Toolate* is inapplicable because this case does not involve insufficient evidence to support the charged crime or a situation where the defendant was not on notice to defend against a different specific-intent crime. For that reason, *Lemcke* is also distinguishable and is further incomparable because that case involved an egregious error in barring the defendant from testifying directly about his mental state. While *Lemcke* seems to support defendant's argument that the juries should not have been instructed on the intent to arouse the victims' sexual desires where the indictment listed only the defendant's sexual desires, we note that *Lemcke* does not discuss any evidence admitted at trial that would have supported the instruction as to the victim. In this case, there was certainly

evidence supporting the instructions given and no evidence suggesting that defendant was prejudiced in preparing his defense. For these reasons, we reject both of defendant's contentions that the jury instructions improperly expanded the charges in the indictment.

¶ 79                                    C. Closing Arguments

¶ 80     During closing arguments in the trial involving R.C., defense counsel objected to the following comments by the State:

"Again, think about [R.C.]. Think about how he had to stand before his abuser and point to him and say this is the person who did that to me.

[Objection overruled.]

The Constitution is an amazing thing. It gives a criminal defendant many, many rights. You don't have to testify. You don't have to present any evidence. You have an absolute right to demand a trial. It doesn't matter how overwhelming the evidence is. It doesn't matter how assured your guilt. You can force this 19-year old boy into court to testify.

[Objection overruled after the court advised the State outside the presence of the jury that it was 'getting close.']"

¶ 81     After this point, the State argued that every fact that R.C. testified to was confirmed by defendant on the video. The State then went through each element it had to prove for each offense and argued the evidence it had presented that it believed established each element.

¶ 82     Courts allow prosecutors great latitude in making closing arguments. *People v. Blue*, 189 Ill. 2d 99, 127 (2000). In closing, the State may comment on the evidence and all inferences reasonably yielded by the evidence. *Id.* However, argument that serves no purpose but to inflame the jury constitutes error. *Id.* at 128. A closing argument must be viewed in its entirety and an allegedly erroneous argument must be viewed contextually. *Id.* The regulation of the substance and style of a closing argument is within the trial court's sound discretion, and the trial court's rulings will not be disturbed absent an abuse of discretion. *Id.* "[E]ven though [a] prosecutor's comment exceeded the bounds of proper argument, the verdict will not be disturbed unless the remark caused substantial prejudice to the defendant, taking into account the *** context of the comment, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." *People v. Johnson*, 208 Ill. 2d 53, 115 (2003).

¶ 83     While the State's comment as to forcing the victim to testify was an improper remark with a purpose seemingly only to evoke sympathy for the victim, the comment was an isolated one in what was a lengthy, otherwise proper closing argument. In light of the overwhelming evidence against defendant in this case, we do not find that this isolated remark substantially prejudiced defendant or affected the outcome of the trial. See *People v. Schneider*, 375 Ill. App. 3d 734, 757-58 (2007) (upholding conviction despite improper prosecutorial remark in closing argument evoking sympathy for victim where evidence against the defendant was overwhelming).

¶ 84     During the trial involving T.S., the State made the following comments during its closing rebuttal argument:

-22-

"If I understand [defense counsel's] argument, the defendant did nothing wrong. I mean isn't that what his argument is? That you should find him not guilty? Okay. I guess I wasn't in the same courtroom. It doesn't make sense. [Defense counsel] says find him guilty of aggravated criminal sexual abuse–

[Objection overruled.]

* * *

But according to the defense attorney's argument he didn't do anything wrong. [Defendant] did nothing wrong. The defendant did nothing wrong in this case.

* * *

Ladies and gentlemen, you heard the evidence in this case. The defense would have you believe that the defendant did nothing wrong in this case, that he's not guilty of 28 charges. That's not what the evidence is in the case."

¶ 85   Defendant argues that the State's comments subjected defense counsel to ridicule by repeatedly arguing that the defense theory was that defendant "did nothing wrong," when in reality his defense was that the State failed to prove the element of a position of trust. Defendant argues that the prosecutor's comments misled the jury into believing that the defense theory was that defendant did nothing wrong, when defense counsel could not tell the jury that he had argued for lesser included offense instructions.

¶ 86   "The trial court has discretion to determine the proper character, scope and prejudicial effect of closing arguments." *People v. Kliner*, 185 Ill. 2d 81, 151 (1998). "Improper remarks warrant reversal only where they result in substantial prejudice to the defendant, considering the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." *Id.* at 151-52. Comments made in closing argument must be considered in the proper context by examining the entire closing arguments of both the State and the defendant. *Id.* at 154. Prosecutors may respond to comments by defense counsel that clearly invite a response. *Id.* Where the challenged remarks were invited, a defendant cannot claim them as error on appeal. *Id.* at 156.

¶ 87   In reviewing both the State's and defendant's closing arguments, we find that the State was responding to defendant's closing argument, in which counsel argued in part that the State presented no evidence supporting a position of trust, authority, or supervision and that defendant should be found not guilty on that basis. Reading the State's rebuttal in its entirety and in context, the challenged comments were part of the State's overall response to defendant's argument that he did not hold a position of trust, authority, or supervision. The State explained that the law did not provide that the element of a position of trust, authority, or supervision applied only to clergy, teachers, or scout leaders, as defense counsel had argued. Rather, the State argued that whether defendant occupied such a position was for the jury to decide, and the State argued the evidence that it believed supported the element. While the isolated statements that defense counsel argued that defendant did nothing wrong were perhaps a poor choice of words to characterize defense counsel's argument that defendant did not hold a position of trust, authority, or supervision and thus should be found not guilty, viewing them in context we do not agree with defendant that the State's comments misled the jury into thinking that the defense theory was that defendant actually did nothing

-23-

wrong, nor do we believe that the State ridiculed the defense. The State's entire rebuttal clearly conveyed to the jury that the State rejected defendant's argument that he did not hold a position of trust, authority, or supervision, and it discussed the evidence that proved otherwise.

¶ 88    Even if the State's comments were improper, they did not deprive defendant of a fair trial. The jury was instructed that the arguments of counsel were not evidence and that it should not return guilty verdicts unless the State met its burden and proved each element of each offense. See *id.* at 158 (finding in light of the context of the proceeding, the prosecutor's comments about the defendant not testifying were not improper nor did the comments deprive the defendant of a fair trial where the jury was instructed that the defendant's decision not to testify was not to be considered in rendering the verdict). Therefore, we reject defendant's argument that the State's closing rebuttal argument in the trial involving T.S. deprived him of a fair trial.

¶ 89    As to the trial on the charges related to A.W., defendant argues that an admitted photograph that depicted A.W. when he first met defendant was used to inflame the jury's passion and prejudice when the prosecutor argued that it depicted what A.W. looked like when the abuse started. Defendant argues that the photograph depicted A.W. at around age 13 or 14 even though the abuse did not start until he was 15. Defendant argues that the prosecutor's remark that the jury "look at this boy with his braces" was so flagrantly improper that he is entitled to a new trial. Because defense counsel did not object, defendant further argues that we should review under plain error or alternatively that we should reverse on grounds of ineffective assistance of counsel. We disagree.

¶ 90    At the outset, we note that the photograph of A.W. was admitted as People's Exhibit No. 7, which his mother identified as A.W.'s eighth-grade picture. His mother testified that A.W. was slightly older than his classmates and turned 15 at the end of his eighth-grade year. She testified that A.W.'s appearance at age 15 was not much different from his appearance in the photo. The trial court ruled on the photograph on a motion *in limine*, finding that the probative value outweighed any prejudicial effect it might have, because the photo depicted A.W. as he appeared when he first met defendant. The court held that the photograph had probative value in the State's argument that defendant held a position of trust, authority, or supervision because it depicted A.W. as he appeared when he first met defendant, prior to the onset of the abuse.

¶ 91    As stated, we consider the entirety of the parties' closing arguments when reviewing a claim of prosecutorial misconduct. The State made the following statements:

    "Now, you had a chance to see [A.W.] testify and he has grown into a man, 19 years old, freshman in college. But this is the boy defendant first met. And the defense attorney made a big deal about how this was his eighth grade photo when he started going to the defendant's house the summer of this year. Look at this boy with his braces. This is the person that the defendant engaged in those acts with."

¶ 92    We do not find the State's comments to be improper based upon the testimony that was adduced at trial, which established that the photograph was taken within a year of the abuse commencing and that A.W.'s appearance from age 14 did not differ much at age 15. The

examination and cross-examination of both A.W. and his mother made it clear that the photograph was taken prior to the start of the abuse but that A.W. did not appear much different when the abuse started. The prosecutor's comments were therefore supported by the record and were also made in isolation. The prosecutor went through the evidence and very clearly informed the jury when the abuse began. Accordingly, we reject defendant's argument that he is entitled to a new trial under either theory he proposes–plain-error review or ineffective assistance of counsel for failing to object to the comments. In fact, we find defendant's argument on this point to be disingenuous, based upon a review of the entire record. The record simply does not support defendant's arguments: "the photographs tended to show that A.W. was a small child at that time"; and A.W.'s mother "admitted that the photographs were not accurate representations of A.W.'s appearance when A.W. was 15 years old." In fact, as discussed, the record supports the opposite conclusions–that A.W. was an older eighth-grader than most and that his appearance at age 15 was similar.

¶ 93                                              D. Sufficiency of Evidence

¶ 94        Defendant argues that there was no evidence that defendant's penis ever touched T.S. prior to the summer of 2007 and therefore his convictions on 18 of the 28 counts must be reversed. Specifically, defendant refers to counts XVII through XXI, XLIV through XLVI, LXIV, LXV, LXVII, LXVIII, CXXXV, CXXXVI, CXXXIX, CXL, CXLV, and CXLVI. We ignore defendant's complaint as to counts LXVII, LXVIII, CXLV, and CXLVI, as those counts pertain to A.W. Defendant concedes that there was no doubt that T.S. testified that defendant placed his penis in T.S.'s mouth and hand during the summer of 2007. However, defendant argues that the evidence showed that, prior to the summer of 2007, defendant placed T.S.'s penis in defendant's mouth and hand but only *asked* T.S. to reciprocate. Defendant argues that there was no evidence that T.S. *actually* did so. We disagree.

¶ 95        A reviewing court faced with a challenge to the sufficiency of the evidence must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Calabrese*, 398 Ill. App. 3d 98, 122 (2010). We will not retry the defendant, and determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are the responsibilities of the trier of fact, not this court. *Id.* at 123. A reversal is warranted only if the evidence is so improbable or unsatisfactory that it leaves reasonable doubt regarding the defendant's guilt. *Id.*

¶ 96        Counts XVII through XXI charged defendant with placing his penis in the mouth of T.S. on or about July 24, 2003, through January 2004. Counts XLIV and XLVI charged defendant with placing his penis in T.S.'s mouth on or about January 15, 2004, through November 2, 2004. Counts LXIV and LXV charged defendant with placing his penis in the mouth of T.S. on or about November 3, 2004, through August 31, 2007. Counts CXXXV and CXXXVI charged defendant with placing his penis in the hand of T.S. between January 15, 2004, and November 2, 2004. Counts CXXXIX and CXL charged defendant with placing his penis in the hand of T.S. between November 3, 2004, and November 2, 2007.

¶ 97        T.S. testified that he was born on January 15, 1991, and that he began spending weekends

with defendant when he was 11 years old. Beginning when he was 11 years old, T.S. testified, defendant used his mouth and hand on T.S.'s penis. The following questioning then occurred:

"Q. Would he ever ask you to put your hand on his penis?

A. Yes.

Q. What would he ask you to do?

A. Move it up and down."

¶ 98    T.S. testified that these acts occurred every time he was with defendant. Regarding the summer of 2007, the State asked T.S. if "any of these sexual acts occur[red] during that summer." T.S. testified yes. When asked what types of acts occurred, T.S. answered, "him putting his mouth and hands on my penis and him having me put my mouth and my hands on his penis." On cross-examination, defense counsel questioned T.S. as follows:

"Q. Your contact with Mike over a time period here started essentially with a hands-on-penis contact or sexual conduct, right?

A. Yes.

Q. At some point it evolved into oral sex, right?

A. Yes.

Q. But the hand on penis contact came first, right?

A. It was actually both."

¶ 99    After additional questioning, on redirect, the State asked T.S. to clarify the year the acts occurred:

"Q. You told [defense counsel] when he was asking you questions that you don't recall everything that happened in 2004?

A. Yes.

Q. You do remember that these acts were occurring?

A. Yes."

¶ 100    Defendant further admitted to mutual masturbation and mutual oral sex incidents. He admitted that the "massaging" began when T.S. was around 12 and occurred fewer than 100 times but would not argue if it was said to have occurred 40 or 50 times.

¶ 101    Taking the evidence in the light most favorable to the prosecution, a rational jury could have inferred from T.S.'s testimony that both the mutual masturbation and the mutual oral sex began when T.S. was 11 years old and continued throughout 2007, especially given that T.S. clarified on cross-examination that the abuse began with *both* types of acts. Further, defendant's admission included that the "massaging" of each other's penises began when T.S. was 12 or 13. The jury also could have believed that the massaging included both types of acts. Accordingly, we reject defendant's argument that the State failed to prove his guilt beyond a reasonable doubt as to the counts for prior to 2007.

E. Ineffective Assistance of Counsel

¶ 102

¶ 103    Defendant alleges that he received ineffective assistance of counsel during sentencing when, before counsel requested and secured any confidential expert psychological assistance, counsel submitted defendant to a probation office pretrial sex offender evaluation and report. Defendant argues that no competent attorney would have submitted his or her client to a public psychological examination before securing a private evaluation. Defendant argues that the public psychological evaluation was then admitted and used against him at both of his sentencing hearings.[2] As the State points out, defendant requested the evaluation and presentencing investigation report during plea negotiations with the State, which ultimately failed. Defense counsel had stated in his request, "We want that. It may assist us, what we may do in a pre-trial."

¶ 104    During the sentencing hearing on the convictions related to R.C., the trial court received victim impact statements, the presentencing investigation report, and testimony from Detective Warner about the investigation that led to the discovery of multiple victims. Defense counsel argued that family tragedies, including the loss of defendant's brother to brain cancer and his ill mother, had recently impacted him. Counsel also argued that defendant had been a productive, law-abiding citizen until the recent events. The trial court discussed the statutory aggravating and mitigating factors, finding in mitigation defendant's lack of a criminal history and the effect that prison would have on his poor health. In aggravation, the court noted the need to deter others, the harm caused to R.C., and defendant's lack of remorse. The court specifically referenced the presentencing investigation report only once, when it indicated that defendant blamed the victims. Otherwise, the report and the psychological evaluation were not discussed by the court or the State during sentencing.

¶ 105    At the sentencing hearing for the convictions relating to T.S. and A.W., the parties stipulated to photographs of other victims, J.W., A.S., M.R., and P.B. The court also took judicial notice of Detective Warner's testimony regarding the other victims, from the sentencing hearing on the convictions pertaining to R.C. Defendant offered no evidence in mitigation. The State argued for the maximum in both cases, which would have resulted in a 240-year sentence for all the counts involving T.S. and A.W. The State largely relied upon the facts of the case and that defendant showed no remorse and for the most part blamed his victims for his conduct. Defense counsel argued that the nature of the conduct was not as egregious as other crimes and did not involve particularly young children. Counsel also argued that defendant had been a law-abiding, normal citizen until his mid-forties, when he was under extreme psychological pressure from fatal illnesses that affected his girlfriend, mother, and brother in a short period of time. Counsel argued that a 150- to 200-year sentence was unwarranted and unnecessary given defendant's age. Counsel asked for the minimum sentence, which still placed defendant in prison for life.

¶ 106    The trial court considered the statutory aggravating and mitigating factors. The court determined in mitigation that there was no permanent physical harm to the victims and that

[2]One sentencing hearing was conducted for the convictions related to T.S. and A.W.

defendant had no prior criminal history. The court determined in aggravation that defendant's conduct caused emotional and mental harm to his victims and that a sentence to deter others was necessary. The court stated that it also considered that defendant had been sentenced on the charges relating to R.C. The court considered defendant a parent's worst nightmare. It considered the fact that it had not seen one sign of remorse despite the fact that his victims were not strangers to him. The court sentenced defendant, on the counts pertaining to T.S., to 120 years' imprisonment, and on the counts pertaining to A.W., to 60 years' imprisonment. The sentences were consecutive for a total of 240 years, factoring in the sentence for the charges pertaining to R.C.

¶ 107    We review ineffective-assistance-of-counsel claims under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). That test requires a defendant to show both that: (1) as determined by prevailing professional norms, counsel's performance fell below an objective standard of reasonableness; and (2) the defendant was prejudiced by counsel's deficient performance. *People v. Guerrero*, 2011 IL App (2d) 090972, ¶ 60. A reviewing court may analyze the facts of its case under either prong first, and if it deems that the prong is not satisfied, it need not consider the other prong. *Id.* To satisfy the deficient-performance prong, the defendant must show that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the sixth amendment. *Id.* To prove prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the result of the proceedings would have been different. *Id.* "A reasonable probability is one that sufficiently undermines confidence in the outcome." *Id.*

¶ 108    Here, defendant fails to meet either prong of *Strickland*. First, defendant fails to establish that trial counsel erred in requesting the preplea presentencing investigation report and sex offender evaluation as a matter of strategy to assist in plea negotiations. Defendant does not articulate what was contained in the report that was used against him that would not have been discovered if he were evaluated first by a private evaluator. In fact, defendant does not at all specify what information contained in the report and evaluation was used against him at sentencing. Much of what was contained in the report that was discussed at sentencing was actually used to defendant's advantage: his lack of criminal history, his health issues, and the recent family illnesses and deaths.

¶ 109    Second, defendant fails to address how he was prejudiced by counsel's alleged error. The trial court entered a valid sentence based on the statutory aggravating and mitigating factors. In the first sentencing hearing, the only comment by the trial court directly referencing the presentencing investigation report referred to defendant's lack of remorse over his conduct, which the trial court *also* noted was evident in his videotaped statement to police when he spoke nonchalantly about the abuse and the victims. In the second sentencing hearing, the trial court did not mention the presentencing report at all and noted that defendant's lack of remorse was evident *throughout* the proceedings. Thus, defendant failed to establish that admission of the report and evaluation prejudiced him at sentencing. Having failed to meet either prong of *Strickland*, defendant's ineffective-assistance-of-counsel claim on this point fails.

¶ 110    Defendant perverts the holding in *Estelle v. Smith*, 451 U.S. 454 (1981), to support his argument that counsel became an advocate for the State by requesting the report and

evaluation. In fact, *Estelle* clearly limited its holding to its facts and stated that a "defendant may request or consent to a psychiatric examination concerning future dangerousness in the hope of escaping the death penalty" and "where a defendant intends to introduce psychiatric evidence at the penalty phase." *Id.* at 472. The facts of our case are not comparable to *Estelle*, where findings in a court-ordered competency-to-stand-trial evaluation were introduced at the defendant's capital sentencing hearing to demonstrate his future dangerousness, which undoubtedly played a role in the jury's decision to impose death. *Id.* at 465. Here, counsel's strategy included obtaining a psychological evaluation and a presentencing investigation report to prepare for plea negotiations. Later, counsel used the information they contained to argue mitigating factors. Unlike in *Estelle*, where future dangerousness was addressed in the evaluation and was a direct issue at the capital sentencing hearing, there is no indication in this case that anything in the report or evaluation played a significant role in the court's determination of defendant's sentence.

¶ 111                                III. CONCLUSION

¶ 112     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 113     Affirmed.

¶ 114     JUSTICE McLAREN, dissenting.

¶ 115     For want of a nail, a shoe, a horse, a battle, a war, and a kingdom, were lost.[3] Just as this initial, seemingly inconsequential, deficiency led to ultimate defeat, initial deficiencies in the indictments have cascaded into an ultimate denial of a fair trial, defects that could have been avoided by the tiny but important step of not only correctly citing to the statutes under which charges were brought but also alleging all of the elements of the charges. By failing to allege in the indictments that defendant was in a position of authority or supervision, instead of alleging only a position of trust, the State initiated a chain reaction of error that the majority has failed to subdue.

¶ 116     Section 111-3 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/111-3 (West 2004)) requires a criminal charge to include both the statutory provision for the crime and the nature and elements of the crime. *People v. Shipp*, 2011 IL App (2d) 100197, ¶ 21. In the indictments in these cases, the State correctly stated the names of the offenses (criminal sexual assault and aggravated criminal sexual abuse) and cited to the statutory provisions alleged to have been violated; however, in alleging the nature and elements of the crimes, the State alleged only the element that defendant held a "position of trust" and it failed to include the elements of positions of supervision and authority.

¶ 117     Words have meaning. In this case, the majority, the trial court, and the State have all

---

[3]A proverb about the death of Richard III of England at the Battle of Bosworth Field in 1485. It has also been recorded that the horse being mired in mud, rather than the loss of an "inconsequential nail," led to the capture and killing of Richard.

failed to comprehend this fact, and the implications of these failures are strewn throughout the majority decision. The failure to recognize that the words "trust," "authority," and "supervision" do not mean the same thing has caused the majority to err throughout its disposition. The State alleged only "position of trust" in the indictments but put in evidence of positions of authority and supervision. In each case, defendant was denied a lesser included offense instruction because he failed to present evidence (or, more appropriately, "nonevidence") of a lack of a position of trust. However, the jury was then instructed that it could find defendant guilty if defendant was in a position of authority or supervision, even though those elements were not charged in the indictments.

¶ 118    The majority posits that defendant was sufficiently apprised that positions of authority and supervision were included in the charges because, in each case, he filed a motion for a bill of particulars requesting specific facts supporting the State's allegation that defendant held a " 'position of trust, supervision or authority,' " and the State answered those requests; therefore "the charges followed the form of the statute." *Supra* ¶ 70. This *non sequitur* takes liberties with a record that is devoid of any evidence that defense counsel was even aware that the indictments were narrowly drawn or that the filing of the motions for the bills of particulars constituted a knowing waiver of the narrow wording of the indictments. Apparently, had defense counsel not filed the motions, the charges would not have followed the form of the statute, and defendant would not have been apprised that the State intended to prove those elements. Defense counsel's actions were, therefore, the basis of a valid claim of ineffective assistance of counsel, as they allowed the State to expand the charges against defendant beyond those described in the indictments. However, we must wonder what the majority would have said had counsel *not* filed the motions.

¶ 119    Perhaps, instead of reaching the majority holding that a defendant's broadly worded motion for a bill of particulars amends, *sub silencio*, a narrowly worded indictment, we could merely hold the State to the more conventional proposition that it is limited to the elements of the charge that are contained in the actual indictment. After all, section 111-3 does not include a response to a motion for a bill of particulars as part of the proper allegation of a criminal charge. Although not raised as an issue here, the State is "required to identify, define, or indicate [in the indictment] the particular 'trust' relationship which it claims [the defendant] possessed over [the victim] and to do so with specificity or particularity." *People v. Sparks*, 221 Ill. App. 3d 546, 549 (1991). In *Sparks*, the court noted that, since the term "position of trust" was not defined in the statute or the indictment (which, incidently, did not allege "authority" or "supervision"), the offense of criminal sexual assault was "not sufficiently described so that [defendant] would understand what he had been charged with." *Sparks*, 221 Ill. App. 3d at 549-50. The court thus affirmed the trial court's dismissal of the indictment.

¶ 120    The State argues that "the statutory citations gave the defendant all the notice he would need to prepare his defense." In *Shipp*, in which the code section of the offense alleged in an information was amended to conform to the description of the actions charged in the information, this court found "the facts alleged in the body of the charge controlling." *Shipp*, 2011 IL App (2d) 100197, ¶ 29. Contrarily, here the State argues that the citation controls. The majority apparently disagrees with both *Shipp* and the State and holds that the proper

ship of state is not the indictment, but a motion for a bill of particulars and the response thereto. Perhaps some clarity and consistency on this issue is appropriate; however, the majority's "solution" is the least workable. Either the indictment's statutory citation or the alleged elements contained in the indictment should control, not some opposing party's document that depends on the defendant's initiative or perseverance and is silent (appropriately so) about the validity or breadth of the indictment. It would appear that the majority will now require defense attorneys to include a critique of an indictment in addition to requesting facts upon which the indictment is based in order to preclude the possibility of a waiver of a defective indictment.

¶ 121       Statutory language must be given its plain and ordinary meaning, and Illinois courts have given the terms "trust," "authority," and "supervision" their common dictionary meanings. See *People v. Reynolds*, 294 Ill. App. 3d 58, 65 (1997). This court has distinguished amongst the positions of trust, authority, and supervision, in *People v. Kaminski*, 246 Ill. App. 3d 77, 81 (1993) ("In common parlance, 'supervision' can occur without authority or even trust, and the legislature's choice of language appears to contemplate application beyond those cases in which the accused adult had authority over the child victim or stood in *loco parentis*."). We also noted that the common meaning of the phrase " 'position of supervision' " "applies in those situations in which an individual is an overseer, caretaker or chaperone of the child." *Kaminski*, 246 Ill. App. 3d at 81. "Position of trust" is a nebulous concept. It is not defined in the criminal sexual assault and aggravated criminal sexual abuse statutes or the IPI instructions. Clearly, it is something different from a position of authority or supervision. It is not as easily demonstrated as authority or supervision, which can be shown by a particular title, such as a police officer, teacher, or scout leader.

¶ 122       The majority gives the State *carte blanche* (literally, "blank card," a signed blank document that is filled out at an agent's discretion, thus granting the agent full discretionary power and unlimited authority (see Black's Law Dictionary 227 (8th ed. 2004))). Even though the elements of positions of authority and supervision were not alleged in the indictments, the State may treat them as it wishes. Once the indictments are treated as the State wills, the majority finds that the trial court properly instructed the juries regarding those elements. Similarly, the grant of *carte blanche* allows the majority to find no error in the trial court's decisions to allow the juries to be instructed that the sexual conduct alleged in the aggravated criminal sexual abuse counts could be "for the purpose of sexual gratification or arousal of the victim or the accused" even though the indictments alleged only the sexual gratification of defendant.[4] Again, the language of the instructions tracked the language of section 12-12(e) of the Criminal Code (720 ILCS 5/12-12(e) (West 2004)), which defines "sexual conduct."

¶ 123       Contrary to the grant of *carte blanche* utilized by the State, a defendant cannot be tried

---

[4]The majority fails to note that it was only at oral argument on the case involving R.C. that the State brought to this court's attention the fact that defendant had failed to object to the inclusion of that language in the instructions. The State can forfeit its ability to argue a defendant's forfeiture by not properly preserving it for review. *People v. McKown*, 236 Ill. 2d 278, 308 (2010). Defendant's deficiency, however, is duly noted by the majority. *Supra* ¶ 73.

on charges different, or at least broader, than those set forth in the indictment. *Stirone v. United States*, 361 U.S. 212, 213-15 (1960); *People v. Henderson*, 142 Ill. 2d 258, 327 (1990). In *Stirone*, the defendant was indicted for unlawfully interfering with interstate shipments of sand used to construct a steel mill; however, at trial, evidence was presented that the defendant also interfered with shipments of steel from the mill, and the trial court instructed the jury that the defendant could be found guilty if he was found to have interfered with shipments of either sand or steel. *Stirone*, 361 U.S. at 213-15. The Supreme Court disagreed, stating:

> "It follows that when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened." *Stirone*, 361 U.S. at 218.

¶ 124    In *People v. Lemcke*, 80 Ill. App. 3d 298 (1980), the defendant was charged with committing indecent liberties with a child (Ill. Rev. Stat. 1977, ch. 38, ¶ 11-4(a)(3)) in that he submitted "to an act of lewd fondling by A.S. with the intent to arouse or to satisfy the sexual desires of himself." *Lemcke*, 80 Ill. App. 3d at 300. The defendant was precluded from testifying about his lack of intent to arouse or satisfy his sexual desires, and he was convicted. On appeal, the defendant argued that the trial court erred in excluding that testimony. The State argued that the "defendant's sexual desires are irrelevant," as the statute in question provided for the commission of the offense where fondling or touching was done "to arouse or to satisfy the sexual desires of *either the child or the person or both*." (Emphasis in original.) *Lemcke*, 80 Ill. App. 3d at 300-01. Thus, according to the State, the conviction could be upheld on evidence of intent to arouse the sexual desires of the victim. This court found this argument to be "without merit." *Lemcke*, 80 Ill. App. 3d at 301. In addition to there being no direct evidence of the victim's sexual desires, "the information specifically charged the defendant with the 'intent to arouse or to satisfy the sexual desires of himself.' Thus the State is precluded from reliance on the alternate mental state provided in the statute." *Lemcke*, 80 Ill. App. 3d at 301.

¶ 125    I find the reasoning of *Stirone* and *Lemcke* persuasive, and I conclude that the trial court erred in instructing the juries, both in adding the position of "authority or supervision" and in adding the language regarding "for the purpose of sexual gratification or arousal of the victim or the accused." The majority's analysis of the sexual gratification language misses the mark; I am unsure why the majority determines that defendant's argument here "seems to indicate that the indictment did not sufficiently apprise him of the fact he might have to defend against arousing or gratifying the victim." *Supra* ¶ 74. Defendant clearly argues that it is the "expansion at trial of the specific intent alleged in the charges" that is at issue. The issue is not that the indictments were defective such that he was unable to prepare a defense. See *DiLorenzo*, 169 Ill. 2d at 323. The argument is that the jury instructions contained elements not contained in the indictments such that the juries could convict him for an intent other than that alleged in the indictments. This goes back to the simple premise that the State should be required to correctly cite the statute under which it is proceeding *and* properly allege the elements of the offense that it plans to prove. Defendant could prepare a defense

-32-

to the elements that were alleged; the State should be held to trying to prove only the elements that it alleged, and not be allowed to expand them later to provide other bases for convictions. The State obtained indictments that did not contain the language that, while contained in the statutes, was contained in the jury instructions. In all these instances, the added language broadened the charges from those alleged in the indictments. Thus, defendant's convictions on all counts should be reversed, as the majority (and the trial court) improvidently granted the State *carte blanche* to enlarge the scope of the indictments, the instructions, and the evidence presented.

¶ 126    The improper use of the unalleged elements also led to error on the issue of the lesser included offense instruction. Defendant tendered an instruction for aggravated criminal sexual abuse as a lesser included offense of criminal sexual assault:

> "A person commits the offense of aggravated criminal sexual abuse when he commits an act of sexual penetration with a victim who is at least 13 years of age but under 17 years of age when the act is committed and he is at least 5 years older than the victim."

The question on appeal is whether the evidence at trial was such that a jury could rationally find the defendant guilty of the lesser offense yet acquit him of the greater offense. See *People v. Medina*, 221 Ill. 2d 394, 405 (2006). If we were to look only at the alleged element of a "position of trust," it is clear that the majority's analysis is lacking and that the trial court erred in not giving the instruction.

¶ 127    As I have already noted, "position of trust" is not defined within the statutes or the instructions. It is a nebulous concept. The majority cites to much testimony of the minors' parents that defendant was in charge (authority or supervision) of the minors when they were at his house; again, this is irrelevant to a discussion of "position of trust." The majority also cites to *Secor*, where the appellate court noted, among other things, "the fact that the families of the defendant and the victim had been friends for 10 years, a circumstance likely to generate mutual trust." *Secor*, 279 Ill. App. 3d at 394.

¶ 128    Such long-time family friendship was clearly part of the evidence as to R.C. and, to a lesser extent, T.S., but not as to A.W. However, the majority never clearly states whose trust is at issue here. Only A.W. testified that he trusted defendant. Neither R.C. nor T.S. testified that defendant was in any position of trust to them. The legislature's intent regarding the element of a position of trust has been described as seeking

> "to prevent sex offenses by those *** in whom *the child* has placed his trust, such as the defendant. It is the trust that makes the child particularly vulnerable, and it is the betrayal of that trust that makes the offense particularly devastating." (Emphasis added.) *Secor*, 279 Ill. App. 3d at 396.

The majority here gives no attention to the fact that only one of these teenaged boys testified to any trust relationship with defendant while at the same time finding that there was no evidence that there was not a position of trust such that the lesser included offense instruction was not justified.

¶ 129    Whether a "position of trust" exists is a question of fact for the jury to decide. Given the indistinct outlines of "position of trust" and the lack of a description of that position in the indictments, I conclude that the evidence in this case was such that a jury could rationally

find that defendant did not hold a position of trust as to R.C. and T.S. and, thus, find defendant guilty of the lesser offense yet acquit him of the greater offense. Both the majority and the State agree that the main outline of aggravated criminal sexual abuse is contained in the charges of criminal sexual assault. *Supra* ¶ 58. The majority states, "we cannot say that the trial court abused its discretion in refusing to instruct the jury on the lesser included offense where the evidentiary requirement to support it was not satisfied." *Supra* ¶ 64 (as it related to T.S.). Neither R.C. nor T.S. testified that he trusted defendant. What evidence of "nontrust" could be presented? What quantum of "nonevidence" is necessary to show that defendant was not in a position of trust?

¶ 130    By determining that defendant was not entitled to the lesser included offense instruction, the trial court in essence held that the State had proven the element of a position of trust and directed a verdict in favor of the State on that element. "[A]lthough a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the evidence." *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). Defendant was entitled to the lesser included offense instruction in the R.C. and T.S. trials. Thus, the trial court erred in not giving the juries defendant's proffered instruction, and we should reverse defendant's convictions of criminal sexual assault and remand those causes for new trials.

¶ 131    I believe that the State was less than competent in myriad of its actions in these prosecutions. The majority fails to find that any error resulted. I believe that the inconsistencies between the indictments and the jury instructions resulted in prejudicial error. These inconsistencies also led to the trial court's error in refusing to give the lesser included offense instruction. These errors committed by the State and approved by the trial court call into question the integrity of the verdicts. "Fairness is the core meaning of due process." *In re Haley D.*, 403 Ill. App. 3d 370, 376 (2010). Defendant did not receive the necessary level of due process to ensure not only that he was properly found guilty of the things for which he was charged, but also that he was *not* prosecuted for and found guilty of things for which he was *not charged*. The former questions the integrity of the verdicts; the latter questions the integrity of the criminal justice system. Errors that impinge upon the integrity of the judicial system require reversal regardless of the weight of the evidence. *People v. Limon*, 405 Ill. App. 3d 770, 775 (2010). This defendant, like King Richard, was trapped in the mire. He should not experience effectively the same fate; therefore, I believe that he is entitled to new trials.